USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/8/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MONZER AL KASSAR,                       :
                                        :       REPORT AND
                                        :       RECOMMENDATION
                        Petitioner,     :
                                        :       13 Civ. 3541 (JSR) (JLC)
        -v-                             :       07 Cr. 354 (JSR)
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                        Respondent.     :
-----------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Jed S. Rakoff, United States District Judge:**

Petitioner Monzer Al Kassar, currently incarcerated in federal prison after being

convicted of conspiring to kill United States citizens and acquire and use anti-aircraft missiles,

providing material support to terrorist organizations, and money laundering, seeks to vacate, set

aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Al Kassar alleges in his petition that

he received ineffective assistance of counsel because his trial attorney failed to: (1) challenge the

government's jurisdiction over the anti-aircraft missile charge; and (2) inform Al Kassar that it

was ultimately his decision whether to testify in his own defense.  Al Kassar further contends

that an article published by one of the jurors after the trial describing the deliberation process

establishes that the jury improperly relied on evidence outside the record, thereby denying Al

Kassar due process of law.  For the reasons set forth below, I recommend that Al Kassar's

petition be denied.

## I.  BACKGROUND

The factual background underlying the investigation of Al Kassar, his arrest, and

conviction was discussed in detail by the Second Circuit in its opinion rejecting his appeal,

United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011) ("Al Kassar II"), and by the District

USDC SDNY
DATE SCANNED   4/8/14

1

Court in its decision explaining its denial of Al Kassar's pretrial motion to dismiss the indictment, United States v. Al Kassar, 582 F. Supp. 2d 488 (S.D.N.Y. 2008) ("Al Kassar I")). Familiarity with those decisions is assumed and the Court therefore includes only a general summary before addressing the issues presented by the petition.

**A.  Investigation, Arrest, and Extradition**

Al Kassar, a national of Spain, had been suspected of illegal arms trafficking by the U.S. government (the "Government") since the 1970s.  Superseding Indictment ("Indictment"), dated June 21, 2007 (No. S3 07 Cr. 354, Dkt. No. 7), ¶ 1.[1]  In 2005, the U.S. Drug Enforcement Agency ("DEA") sought to infiltrate Al Kassar's international arms trafficking network with paid undercover informants posing as members of Fuerzas Armadas Revolucionarias de Colombia ("FARC"), the Colombian rebel group designated a terrorist organization by the United States.  Trial Transcript ("Tr."), at 343, 351-52; Indictment, ¶ 6.  Two informants met with associates of Al Kassar and, through these contacts, eventually with Al Kassar himself, representing that they were seeking weaponry for use against American citizens and assets in Colombia.  Tr. at 343, 351-52, 627-28.  Al Kassar and the informants subsequently negotiated a deal for the sale of various arms, including grenades, rifles, and anti-aircraft missiles, and the DEA transferred a down payment of 100,000 Euros into an account controlled by Al Kassar.  Id. at 465-66, 656, 660, 712-13.  Arrangements were made for the weapons to be acquired in Romania and Bulgaria and, Al Kassar was led to believe, shipped to South America on a vessel bound for Suriname under the cover of international transport documents provided by the DEA. Id. at 344, 348, 374.

---

[1]      Certain documents have been filed solely on the docket of Al Kassar's criminal case and are so indicated by the inclusion of that case number, No. S3 07 Cr. 354.  All other citations to docket entries without a case number refer to the civil docket of Al Kassar's petition.

The sting was completed on June 7, 2007, when Al Kassar was arrested at Madrid Airport and his mansion was raided, leading to the seizure of copious documents linking him to the intended arms transaction.  Id. at 379, 387-408.  Al Kassar's associate and later co-defendant, Luis Felipe Moreno Godoy, was also arrested on the same date by Romanian authorities in Bucharest.  Id. at 379-80.  Al Kassar and Godoy were subsequently extradited to New York on June 13, 2007 to await trial.  Id. at 519-20.

## B.  Indictment, Trial, and Sentencing

Al Kassar and Godoy were indicted on five counts: (1) conspiracy to kill U.S. nationals, Indictment, ¶¶ 1-11; (2) conspiracy to kill U.S. officers and employees, id. at ¶¶ 12-15; (3) conspiracy to acquire and use anti-aircraft missiles, id. at ¶¶ 16-19; (4) conspiracy to provide material support or resources to a foreign terrorist organization, id. at ¶¶ 20-23; and (5) money laundering, id. at ¶¶ 24-25.[2]  The two defendants, represented by counsel, moved to dismiss the indictment, arguing that their due process rights had been violated by the Government's "outrageous conduct" in executing a "bait and switch" by which they were induced to commit the crimes alleged.  Al Kassar I, 582 F. Supp. 2d at 491-92.  They contended that the Government thereby manufactured federal jurisdiction by changing the nature of the arms transaction into one designed to harm Americans, did not sufficiently establish a nexus between the defendants' conduct and the United States, and charged them with crimes that they could not

---

[2]      A third individual, Tareq Mousa Al Ghazi, was also indicted but due to his hospitalization for a serious heart condition a week prior to trial, his case was severed: he was tried, convicted by a different jury in March 2009 on three counts (conspiracy to kill U.S. officers and employees, to acquire and use anti-aircraft missiles, and provide material support and resources to a foreign terrorist organization), and sentenced to imprisonment for 300 months. See United States v. Al Ghazi, No. S3 07 Cr. 354 (JSR), 2009 WL 1605741, at *1 (S.D.N.Y. June 9, 2009).

reasonably have expected would violate U.S. law.  See id. at 491-95.  The Court denied the motion in its entirety.  Id. at 495.

The trial of Al Kassar and Godoy began on November 5, 2008.  Tr. at 278.  The Government's case consisted of the testimony of the undercover DEA informants, recordings of taped telephone conversations between them and the defendants, a hidden video recording of meetings at Al Kassar's mansion, and documents linking Al Kassar to the FARC-bound weapons.  See Tr. at 288-90.  The defense presented as witnesses Al Kassar's daughter, who testified about her family background and her knowledge of her father's business and associates, and two Spanish law enforcement officials with a history of working with Al Kassar, whose taped testimony was played for the jury.  Tr. at 1271-92, 1358-59.

On November 20, 2008, the jury returned a guilty verdict on all counts against the defendants, Tr. at 1549-52, and on February 24, 2009, the Court sentenced Al Kassar to 360 months' imprisonment and Godoy to a prison term of 300 months, see Transcript of Sentencing Proceedings (No. S3 07 Cr. 354, Dkt. No. 126).

## C.  Juror's Post-Trial Publication

The following summer, in 2009, Steve Cohen, one of the jurors in the trial of Al Kassar and Godoy, published an article offering an insider's perspective of the proceedings.  Steve Cohen, Inside a Terror Trial: How a Manhattan Jury Reached Its Verdict in the Government's Case Against International Arms Dealer Monzer al-Kassar, CITY JOURNAL, Summer 2009, Vol. 19, No. 3, http://www.city-journal.org/2009/19_3_al-kassar.html, attached as Exhibit R to Petitioner's Memorandum of Law in Support of Motion to Vacate, Set Aside, or Correct Sentence ("Pet. Mem.") (Dkt. Nos. 1-2).  The article appeared in the Summer 2009 edition of City Journal, described on its website as a "quarterly magazine of urban affairs" and "the

nation's premier urban-policy magazine." About Us, CITY JOURNAL, http://www.city-journal.org/html/about.html (last visited April 8, 2014).  In the article, Cohen recounts events from jury selection to verdict and sentencing, outlining his thoughts on the Government and defense attorneys, the witnesses, the judge, and the evidence presented to the jurors.  He explains that after the trial, he "reconvened the jurors to ask them about their recollections," characterizing the article as "our story," Pet. Mem. Ex. R, at 1, although none of the other jurors is quoted or identified in the article as the direct source of any of the information presented.

Cohen describes with specificity his and other jurors' impressions of the various elements of the prosecution and defense cases.  Id. at 6-9.  For instance, he identifies how the jury grappled with the "two main thrusts" of the defense's attempt to create reasonable doubt, the first dealing with an inference that one of the DEA agents may have destroyed evidence, and the second concerning why the agents stopped recording conversations with Al Kassar towards the end of the investigation.  Id. at 7.  According to Cohen, the jury ultimately dismissed these concerns as unfounded and rejected the defense theory that Al Kassar was in fact aiding Spanish intelligence in a reverse sting.  Id. at 7-8.  In particular, and relevant to Al Kassar's contentions in the instant petition, Cohen recounts how the jury considered whether there was evidence to support the anti-aircraft missile and material support charges: "It takes us only about 30 minutes to agree that yes, there is.  Al-Kassar extolled the virtues of the particular [missiles] he could provide in no fewer than four conversations.  He emphasized that [the weapons] were particularly effective in shooting down the types of helicopters that America was using in Colombia."  Id.  Cohen subsequently explains how the jurors sorted through each of the required elements of the remaining charges, ultimately voting unanimously to convict on all five of them.  Id. at 7-9.

The article then recounts how Cohen was the sole juror to speak with defense lawyers and the press after the trial, id. at 9, and how he subsequently sought information that had not been made available to the jury during trial (including excluded evidence about Al Kassar's acquittal on charges that he provided weapons to terrorists who had hijacked a cruise ship in 1985 and Al Kassar's previous work for Spanish and other intelligence agencies), id. at 10. Cohen writes that he had tried to contact the DEA and lawyers involved in the case after the trial, to no avail. Id. He evidently attended the sentencing hearing on February 24, 2009, where he was recognized in the audience by Al Kassar. Id. The article concludes with Cohen's thoughts about Al Kassar's case in the context of U.S. counterterrorism efforts. Id. at 10-11.

## D. Post-Trial Proceedings

### 1. Direct Appeal

In an appeal dated March 13, 2009 (Notice of Appeal, No. S3 07 Cr. 354, Dkt. No. 124), Al Kassar and Godoy challenged their convictions before the Court of Appeals based on violations of due process, lack of subject-matter jurisdiction, improper exclusion of exculpatory evidence, improper jury instructions as to the element of scienter, and insufficient legal basis and evidence to support the charge of conspiracy. See Al Kassar II, 660 F.3d at 117. No issues arising out of Cohen's article, which was published subsequent to the filing of the appeal but before it was fully briefed and decided, were raised on appeal. In a September 21, 2011 opinion, the Second Circuit dismissed Al Kassar's due process and jurisdiction claims, finding that the conspiracy counts explicitly provided for extraterritorial application and that a sufficient nexus existed between defendants' activity and the United States based on their intent to harm American targets abroad. Id. at 118-19. The Second Circuit also found irrelevant the fact that it had been the DEA agents who had first suggested American targets while the deal was

negotiated, and dismissed the contention that the investigation had otherwise demonstrated unconstitutionally outrageous government conduct. Id. at 121-22. Similarly unavailing was defendants' claim that the trial court had improperly excluded certain classified documents as evidence, which the Second Circuit agreed were of limited probative value. Id. at 123-24. As to the various attacks on the conspiracy charges, the court: analyzed the statute concerning unlawful use of anti-aircraft missiles to find that it covers conspiracy, id. at 124-25; found that the jury had been properly instructed as to the scienter requirements of the various counts, id. at 126-27; held that the evidence at trial was sufficient, id. at 128-29; and concluded that the material support charge did not criminalize "mere membership" in a terrorist organization in violation of the Fifth Amendment, id. at 129-30.

## 2. Instant Petition

Al Kassar, represented by new counsel, filed the instant petition along with supporting papers in May 2013. Pet. Mem.; Appendix of Exhibits; Notice of Motion (Dkt. Nos. 1-3).[3] The

---

[3] There is some question whether Al Kassar's petition is timely. After the Second Circuit affirmed his conviction on September 21, 2011, Al Kassar filed a petition for certiorari, which the Supreme Court denied on May 14, 2012. See Al Kassar v. United States, 132 S. Ct. 2374 (2012). Petitions for relief under Section 2255 must be filed within one year of "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). In Clay v. United States, 537 U.S. 522, 525 (2003), the Supreme Court held that a conviction becomes final when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." Id. at 527; accord Moshier v. United States, 402 F.3d 116, 118 (2d Cir. 2005) (citation omitted). Thus, in order to be timely Al Kassar's Section 2255 petition had to have been filed by May 13, 2013.

The docket sheet in the criminal case lists a "memorandum of law in support of motion to vacate" as filed on May 13, 2013 (No. S3 07 Cr. 354, Dkt. No. 148), but the "motion" itself was not filed until May 24, 2013 (No. S3 07 Cr. 354, Dkt. No. 149). On the related civil docket for Al Kassar's instant petition, the same memorandum of law filed in the criminal case in support of the petition was not docketed until May 24, 2013 (Dkt. No. 1) and the "motion" was not filed until May 31, 2013 (and was also dated May 31, 2013) (Dkt. No. 3). The petition would not be deemed timely if it were not considered to be filed until either May 24, 2013 (as reflected on the criminal docket) or May 31, 2013 (on the civil docket). It would, however, be timely if the

petition was referred to the undersigned by Order of Reference dated June 10, 2013 for

preparation of this Report and Recommendation.  (Dkt. No. 4).  After receiving an extension in

order to prepare an affidavit by Al Kassar's trial counsel, see Endorsed Letter dated July 5, 2013

(Dkt. No. 6), the Government filed its memorandum of law in opposition ("Gov't. Opp.") on

September 16, 2013.  (No. S3 07 Cr. 354, Dkt. No. 166).  Al Kassar submitted a reply ("Pet.

Reply") on November 1, 2013.  (Dkt. No. 11).

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  Section 2255 Review

A prisoner in federal custody may seek to have his sentence vacated, set aside, or

corrected on the grounds that it "was imposed in violation of the Constitution or laws of the

United States, or that the [trial] court was without jurisdiction to impose such sentence, or that

the sentence was in excess of the maximum authorized by law, or is otherwise subject to

collateral attack."  28 U.S.C. § 2255(a).  However, the grounds for such a collateral attack under

Section 2255 are much more limited than those available on a direct appeal.  See United States v.

Addonizio, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of

jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental

defect which inherently results in a complete miscarriage of justice.'"  United States v. Bokun,

73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).  "The

reasons for narrowly limiting the relief permitted under § 2255 – a respect for the finality of

criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying

operative date were May 13, 2013, the filing date of the memorandum of law reflected on the
criminal docket.  Given that the Government does not challenge the timeliness of the petition –
and that petitioner's counsel did file documents in support of the petition before the statute of
limitations had run – the Court does not recommend denial on timeliness grounds.

issues years after the underlying events took place – are 'well known and basic to our adversary system of justice.'" Bokun, 73 F.3d at 12 (quoting Addonizio, 442 U.S. at 184 & n.11).

A collateral challenge cannot be used as a means to litigate issues that should have been raised on direct appeal.  See United States v. Frady, 456 U.S. 152, 165 (1982) ("[A] collateral challenge may not do service for an appeal.").  A petitioner "is barred from advancing a new claim in a Section 2255 motion unless he can show cause for his procedural default" in failing to raise the claim on direct appeal, "and actual prejudice resulting from the error."  Diaz v. United States, No. 12 Civ. 7302 (CM), 2013 WL 6439382, at *1 (S.D.N.Y. Dec. 6, 2013) (quoting Riascos-Prado v. United States, 66 F.3d 30, 34 (2d Cir. 1995) (internal quotation marks omitted)); see also Bousley v. United States, 523 U.S. 614, 622 (1998).  "[E]xistence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded [] efforts to comply," including a "factual or legal basis for a claim [that] was not reasonably available" or "interference by officials."  Coleman v. Thompson, 501 U.S. 722, 753 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 487 (1986)).  If cause cannot be shown, a petitioner may prevail only if he demonstrates prejudice so substantial "that a fundamental miscarriage of justice would result from a failure to entertain the claim."  McCleskey v. Zant, 499 U.S. 467, 494 (1991).

Importantly, however, claims of ineffective assistance of counsel may be brought in a Section 2255 petition regardless of whether they were first raised on appeal.  See, e.g., Romero v. United States, 933 F. Supp. 2d 528, 531 (S.D.N.Y. 2013) (citing Massaro v. United States, 538 U.S. 500, 504 (2003)).  This exception to the procedural default bar exists "on the theory that the ineffective assistance of counsel itself provides the 'cause' for the failure to appeal the issue."  Rodriguez v. United States, No. 09 Civ. 2063 (JSR) (JLC), 2012 WL 1059355, at *6 (S.D.N.Y.

Mar. 29, 2012), Report and Recommendation, <u>adopted by</u> Order dated September 27, 2012 (Dkt. No. 26) (quoting <u>Rosa v. United States</u>, 170 F. Supp. 2d 388, 396 (S.D.N.Y. 2001)); <u>but see</u> <u>Bloomer v. United States</u>, 162 F.3d 187, 192 (2d Cir. 1998) (petitioner represented by *new* counsel on direct appeal obligated to raise ineffective assistance claim as to *trial* counsel on appeal or be procedurally barred from collateral attack).

Finally, the district court may adjudicate a Section 2255 petition without a hearing if the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); <u>see</u> <u>Chankoo v. United States</u>, No. 13 Civ. 4963 (PKC), 2014 WL 904478, at *2 (S.D.N.Y. Mar. 6, 2014) ("[I]f the moving papers themselves disclose the inadequacies of the defendant's case . . . the court may rest its decision solely on the basis of the affidavits and memoranda submitted and need not resort to an evidentiary hearing.") (quoting <u>United States v. Salameh</u>, 54 F. Supp. 2d 236, 248 (S.D.N.Y. 1999)). "It is within the district court's discretion to determine whether a hearing is warranted" and the court may rely on "a wide variety of tools" to develop the record as necessary. <u>Pham v. United States</u>, 317 F.3d 178, 180, 184 (2d Cir. 2003) (citations omitted). A hearing usually will not be held unless, "viewing the evidentiary proffers . . . and record in the light most favorable" to him, the petitioner "may be able to establish at a hearing a prima facie case for relief." <u>Puglisi v. United States</u>, 586 F.3d 209, 213 (2d Cir. 2009).

### 2. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are governed by the standards set forth by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). To succeed, the petitioner must first establish "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," that is, a performance that fell below "an objective standard of reasonableness" under "prevailing professional norms." <u>Id.</u> at 687-88.

"The court's review must be highly deferential and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." United States v. Peterson, 896 F. Supp. 2d 305, 312 (S.D.N.Y. 2012) (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted).

Second, the petitioner "must show that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687; accord Gueits v. Kirkpatrick, 612 F.3d 118, 122 (2d Cir. 2010). This inquiry centers on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart, 506 U.S. at 372 (citation omitted). To so determine, the court must be satisfied of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 693-94. See also Glover v. United States, 531 U.S. 198, 203 (2001); Puglisi, 586 F.3d at 215.

Of relevance here, a "trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of th[e] constitutional right" to testify on his own behalf. Rega v. United States, 263 F.3d 18, 21 (2d Cir. 2001) (citations omitted); see also Rock v. Arkansas, 483 U.S. 44, 49-51 (1987). "Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant." Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997).

Strickland applies with equal force to ineffective-assistance claims based on an attorney's advice (or lack thereof) regarding the right to testify. See, generally, Wiggins v. Grenier, 132 Fed. App'x 861, 867 (2d Cir. 2005). The presumption under the first prong that trial counsel was

effective, and therefore properly advised a client of the right to testify, must be overcome. See United States v. Montilla, 85 Fed. App'x 227, 230 (2d Cir. 2003); Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001). Consequently, "[a] petitioner's unsupported assertions that defense counsel failed to inform him of his right to testify are insufficient." Hayward v. Brown, No. 09 Civ. 6495 (LAK) (AJP), 2010 WL 2629037, at *22 (S.D.N.Y. July 1, 2010) (citing Montilla, 85 Fed. App'x at 230). "[I]n the absence of objective evidence of corroboratory circumstances, such post-trial claims must be viewed with some suspicion." United States v. Wisniewski, 478 F.2d 274, 284 (2d Cir. 1973); accord Hayward, 2010 WL 2629037, at *23 (mere self-serving statements insufficient for petitioner to meet burden); DeLuca v. Lord, 858 F. Supp. 1330, 1360-61 (S.D.N.Y. 1994) (corroborative testimony supported finding petitioner unaware decision to testify ultimately was hers). Moreover, under the second Strickland prong, the prerequisite showing of prejudice remains necessary. See, e.g., United States v. Noorzai, 953 F. Supp. 2d 499, 507 (S.D.N.Y. 2013) ("[Petitioner] fails to show a reasonable probability that, had he testified at trial, the jury would not have convicted him."); Jenkins v. Artuz, No. 98 Civ. 7837 (JBW), 2003 WL 21499889, at *2 (E.D.N.Y. June 13, 2003) (petition fails where no showing that petitioner, even if not informed of right to testify before grand jury, actually prejudiced because indictment would have issued nonetheless).

### 3. Impeachment of Verdict Through Post-Trial Juror Statements

Impeachment of a final verdict through the use of a juror's post hoc statements about the deliberation process is proscribed by Rule 606(b) of the Federal Rules of Evidence, which states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1); see also Attridge v. Cencorp Div. of Dover Technologies Int'l, Inc., 836 F.2d 113, 116 (2d Cir. 1987) ("[Juror testimony is prohibited a]s to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict.") (quotation omitted).   There are three narrow exceptions to the prohibition, allowing a juror to testify as to any: (A) "extraneous prejudicial information . . . improperly brought to the jury's attention"; (B) "outside influence . . . improperly brought to bear on any juror"; or, (C) "mistake . . . made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2). Even in light of one of these circumstances, however, there must be "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial" for a probe of a juror's statements to be warranted.  United States v. Stewart, 433 F.3d 273, 302-03 (2d Cir. 2006) (quoting United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983)).

The rationale behind the rule is well-established: it "prevents jurors from being 'harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to' overturn a final judgment." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 107 (2d Cir. 2004) (quoting McDonald v. Pless, 238 U.S. 264, 267-68 (1915) ("If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.")).  As the Second Circuit has explained, "jurors have a right to go home at the end of the trial . . . and they have a right to return to the community and enjoy the privacy and anonymity that they enjoyed before they were summoned

to serve as jurors." United States v. Radonjich, 1 F.3d 117, 120 (2d Cir. 1993) (quoting district court opinion).

## B. Al Kassar's Claims All Lack Merit

### 1. Al Kassar's Counsel Did Not Provide Ineffective Assistance

#### a. Counsel Challenged the Government's Extraterritorial Jurisdiction

Al Kassar first contends that his trial counsel rendered ineffective assistance by failing to challenge the Government's jurisdiction over his involvement in the acquisition in Europe of weapons purportedly bound for Colombia. See Pet. Mem. at 15-17. He relies on United States v. Yousef, 327 F.3d 56 (2d Cir. 2003), which requires evidence of a "sufficient nexus" between a defendant and the United States where the criminal conduct occurs entirely beyond American shores. Id. Count three of the indictment charged Al Kassar and his co-defendants with conspiracy to export missile systems designed "to attack United States helicopters in Colombia" in contravention of 18 U.S.C. § 2332g. Indictment ¶ 18. Jurisdiction under that statute is triggered where, among other grounds, "the offense is committed against any property that is owned, leased, or used by the United States . . . whether the property is within or outside the United States." 18 U.S.C. § 2332g(b)(4). According to Al Kassar, counsel failed to highlight that there was "[n]ot a shred of proof" – neither witness testimony nor documents admitted into evidence – that "demonstrated which, if any, helicopters in Colombia" satisfied this requirement. Pet. Mem. at 17.

Al Kassar's claim is unavailing. First, counsel raised and briefed the insufficient nexus contention when the co-defendants moved to dismiss the indictment before trial. Memorandum of Law in Support of Motion to Dismiss Indictment (No. S3 07 Cr. 354, Dkt. No. 28) (arguing that jurisdiction cannot be established lawfully because "the Government itself lured [co-

defendants] into engaging in the conduct comprising the nexus"). Al Kassar's counsel joined in this motion. See Memorandum of Law of Al Kassar in Support of His Motion to Dismiss the Indictment (No. S3 07 Cr. 354, Dkt. No. 55), at 2. In response, as Al Kassar urges now, the trial court specifically weighed the applicability of Yousef, where the Second Circuit found the nexus requirement satisfied in the case of defendants who had conspired while abroad to procure missiles in order to attack American aircraft located overseas. Al Kassar I, 582 F. Supp. 2d at 494 (citing Yousef, 327 F.3d at 112). Although Al Kassar and his co-defendants were charged with conspiring to supply arms, rather than to use them directly as in Yousef, the trial court found the nexus adequately satisfied: "given the substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary." Al Kassar I, 582 F. Supp. 2d at 494 (quoting Yousef, 327 F.3d at 112) (alterations and internal quotation marks omitted).

Second, even assuming that counsel's pretrial pursuit of this argument was somehow so inadequate as to be constitutionally defective (a proposition for which Al Kassar offers no support),[4] Al Kassar is not entitled to relief because he cannot demonstrate prejudice under the second Strickland prong. As the Government points out, there was sufficient evidence presented at trial that Al Kassar *intended* that the missiles he conspired to acquire were to be used against U.S. assets. Gov't Opp. at 18-20 (citing, inter alia, testimony of DEA informant about Al Kassar's statements promising aid against the United States and identifying suitable missiles to

---

[4]     In his Reply Memorandum, Al Kassar dismisses the pretrial work by counsel because it did not raise the "precise statutory jurisdictional argument urged by [Al Kassar]," and repeats in cursory fashion his argument that counsel did not "put the government to the task of proving its case against him, beyond a reasonable doubt," as to actual U.S. ownership of the helicopters. Pet. Reply, at 1-2. For the reasons that follow, Al Kassar's position is untenable.

take down U.S. helicopters, made both in person and in email).  That intent to harm what he believed to be U.S. assets was the crux of the relevant inquiry, as the Second Circuit made clear in rejecting the "insufficient nexus" argument raised in Al Kassar's direct appeal: "Jurisdictional nexus is determined by the *aims* of the conspiracy, not by its effects."  Al Kassar II, 660 F.3d at 119 (emphasis added) ("True, the defendants' conduct never came close to harming any U.S. person or property, but this is irrelevant for conspiracy offenses, which often result in no palpable harm.").  Thus, Al Kassar's focus on counsel's supposed failure to challenge the lack of proof that the target helicopters were *in fact* owned, leased, or used by the United States is beside the point.  Even if his attorney had attacked the Government's case to suit Al Kassar's erroneous interpretation of the nexus requirement, the result of conviction as to the anti-aircraft missile conspiracy charge, applying the correct analysis, would have been unchanged.[5]

### b.  Al Kassar Has Not Established that He was Denied the Right to Testify

Al Kassar alleges as a second ineffective assistance claim that his trial counsel never informed him that it was ultimately his decision whether to testify at trial: "He was not made to understand he possessed ultimate decision-making authority.  Had he known he possessed this authority, he would have testified in his own defense."  Pet. Mem. at 20.  According to Al Kassar, he "insisted on [] testifying in the trial as a weapons expert [him]self," in order to point out he "really was playing with the paid informants" by providing incorrect information about the arms for sale.  Al Kassar Affidavits ("Al Kassar Aff."), attached as Exhibit T to Pet. Mem.

---

[5]     The Government further argues that Al Kassar's challenge based on insufficient nexus must fail because, even had the evidence that the weapons were to be used against U.S. property been inadequate, the criminal statute in question provides for jurisdiction on other grounds that the record also established.  Gov't. Opp. at 20-21 (citing 18 U.S.C. § 2332g(b)(3)).  Because the Court recommends denying Al Kassar's claim on other grounds, the Court need not reach this argument.

("Appendix of Exhibits," Dkt. No. 2), at 11.[6]  In his memorandum of law, Al Kassar asserts that

had he testified, he would have told jurors about his family background, good works, innocence

in the arms charges, and real goal of conducting a reverse sting operation of his own against the

purported FARC agents.  Pet. Mem. at 20.  Additionally, Al Kassar states he would have

discredited James Soiles, the DEA agent whom he believes masterminded the sting against him.

Id.  Al Kassar intimates that Soiles tampered with evidence as part of a vindictive investigation

because Al Kassar had been acquitted in 1995 of playing a role in the hijacking of a cruise ship

despite Soiles' attempts to forge evidence against him in that case.  Id. at 1-2, 8, 20.  His

testimony "would have addressed precisely the issues confounding the jury," Al Kassar

concludes, but because counsel failed to yield to his desire to testify, the defense case was left

with "gaping evidentiary holes."  Id. at 20-21.

For his part, Al Kassar's trial counsel affirms in his affidavit that he advised Al Kassar

about the procedures of the American legal system and the rights of criminal defendants,

including the right to testify in one's own defense, call and cross-examine witnesses, and be

_____

[6]       Al Kassar has submitted several affidavits in support of his petition, dating from January
and February 2013 and gathered in one exhibit.  Rather than cite to each discrete affidavit, the
Court refers to the pagination found on the lower right corner of each page of Exhibit T.

    In the various affidavits, Al Kassar outlines, inter alia, grievances about his treatment in
prison, Al Kassar Aff. at 9-10, financial and emotional hardships on himself and his family, id. at
6, 18, and the vendetta carried out against him by the lead DEA investigator, id. at 4.  He lays out
numerous complaints about his legal team, see id. at 11-13, including the accusation that his
attorney was complicit in a "Zionist plot" against him with the DEA and the Government, id. at
4.  While he criticizes point-by-point his attorney's decisions regarding whether or not to call
certain witnesses or pursue certain evidentiary leads, Al Kassar refers to his desire to testify only
four times: in the quotation cited in the text; to state that his "lawyers never discussed with [him]
the benefits and importance of taking the stand," instead advising "always that they were
winning the case so it was not warranted," id. at 12; to note that "[t]he judge did not address us
directly as to our taking the witness stand in our own defense," id. at 15; and finally to say
"[b]ecause I was not able to take the witness stand, I was unable to present to the jury, the letters
of 'Thanks' from America which are in the discovery and [which] my lawyer ignored," id.

convicted only upon proof beyond a reasonable doubt by a unanimous jury. Affidavit of Ira Lee Sorkin ("Sorkin Aff."), dated August 20, 2013 and attached as Exhibit A to Gov't. Opp., at ¶ 9. Counsel further affirms that his explanations to Al Kassar about these matters began at their first meeting in Al Kassar's Spanish jail and occurred thereafter at consultations before, during, and after trial. Id. Counsel states that Al Kassar was told that he had the right to testify but warned that "the government would cross-examine him" and that "his testimony and the government's apparent extensive intelligence on his arms business of over 30 years could be very damaging to his credibility," along with exposing him to questions about a possible role in narcotics trafficking referenced by his co-defendant. Id. at ¶ 22. According to counsel: "At no time was [Al Kassar] ever told that he should not testify. He chose voluntarily not to do so after being advised of the risks of cross examination. At no time did I tell him that his testimony was 'unnecessary or unwarranted.'" Id.

Al Kassar, in an affidavit filed in reply, asserts that "no discussion ever took place after I arrived in America regarding the American legal system," nor did any such conversation occur in Spain prior to extradition. Al Kassar Affidavit in Reply ("Al Kassar Reply Aff."), attached as Appendix to Pet. Reply, at 1-2. In Al Kassar's account, his attorney said to him: "Don't take the stand. You leave yourself open because we're on a winning case." Id. at 6. Al Kassar does not appear to deny that his trial counsel cited his past in arms dealing and a possible narcotics connection as problematic areas that would come up under cross examination, but counters that because his "entire history was of legal arms dealing" and he was never charged or implicated with narcotics trafficking, he had "nothing to hide." Id. Consequently, he "never voluntarily told" counsel that he "did not want to testify," but remembers being told that his testimony was "unwarranted" and not knowing at the time "what that word meant." Id.

On the record presented to the Court, Al Kassar fails to overcome the presumption that defense counsel was effective and properly advised him of his right to testify. See Hayward, 2010 WL 2629037, at *22; Guidice v. United States, No. 03 Civ. 4983 (SJ), 2007 WL 1987746 at *14 (E.D.N.Y. July 3, 2007). All told, Al Kassar relies on nothing more than his own assertions that he wished to testify but was "silenced" by counsel who refused to defer to him. Pet. Mem., at 20; see supra n.6. No independent evidence is proffered to satisfy his burden, nor does Al Kassar include basic details that would provide content to his claims that he was never informed that it was his decision whether to testify, such as when the issue was raised and how, when, and in what manner he was rebuffed. Therefore, his allegations can only be characterized as generic, self-serving, and conclusory. See Chang, 250 F.3d at 86 (rejecting "a generic claim . . . based solely on [petitioner's] own highly self-serving and improbable assertions"); Wisniewski, 478 F.2d at 284 ("[I]n the absence of objective evidence of corroboratory circumstances, such post-trial claims must be viewed with some suspicion."); Davison v. United States, No. 00 Civ. 3064 (LAP), 2001 WL 883122 at *8 (S.D.N.Y. Aug. 3, 2001) ("[B]lanket assertions against [] trial counsel's performance in a self-serving affidavit," without objective proof, is insufficient.). Al Kassar's assertion that, in the course of his high-profile extradition and trial, his counsel – who describes extensive efforts to build a credible defense case, including pursuing testimony in Spain and seeking out experts, evidently in consultation with the client, see Sorkin Aff., at ¶¶ 10-14 – did not have a *single* discussion with him about the American legal system is implausible. Al Kassar Reply Aff., at 1-2. "[F]aced with self-serving allegations that are contradicted by a credible affirmation by a trial attorney," this Court "choose[s] to credit the attorney and dismiss the ineffective assistance of counsel claim without further hearings." Castrillo v. Breslin, No. 01 Civ. 11284 (GBD) (GWG), 2005 WL 2792399, at *14 (S.D.N.Y.

19

Oct. 26, 2005) (citations omitted), Report and Recommendation, <u>adopted</u> <u>by</u> Order dated Dec. 5,

2005 (Dkt. No. 21).  <u>See also</u> <u>Noorzai</u>, 953 F. Supp. 2d at 507 (crediting attorney's affidavit over

petitioner's "self-serving, conclusory" statements); <u>Davidson</u>, 2001 WL 883122 at *8

(petitioner's self-serving affidavit without more fails to discredit counsel's sworn statement that

petitioner's right to testify was made clear).

 In any event, Al Kassar cannot demonstrate that he was prejudiced by not testifying in his

own defense.  First, had Al Kassar taken the stand, as his trial counsel and the Government point

out, he would have been exposed to attacks on his credibility based on the intelligence gathered

concerning his decades of arms dealing.  Sorkin Aff., at ¶ 22; Gov't. Opp., at 20.  In this regard,

Al Kassar's testimony quite possibly could have potentially harmed, rather than aided, his

defense.  <u>See</u>, <u>e.g.</u>, <u>Caracappa</u>, 614 F.3d at 48 (finding no prejudice where testimony would have

exposed petitioner to questioning related to bad acts evidence); <u>Davidson</u>, 2001 WL 883122 at

*9 ("defense would have been severely prejudiced" by impeachment of defendant's credibility

had he testified).

 Second, Al Kassar does not meet his burden of establishing that, had he been able to

present his desired testimony, there was a "reasonable probability that the verdict would have

been different."  <u>Brown</u>, 124 F.3d at 84; <u>Strickland</u>, 466 U.S. at 693-94.  Al Kassar presents no

detail as to how his proposed testimony about his personal and family history, no matter how

positive a light it might have cast on his character, would have led to his acquittal despite the

substantial evidence, including informant testimony and recorded conversations, implicating him

in illegal conduct.  As to intended testimony about his innocence and actual intention of

engaging in a "reverse sting" on the undercover informants, given the lack of any corroborating evidence identified by Al Kassar, its significance would have depended solely on his credibility.[7] Similarly, there is not a scintilla of evidence elsewhere in the record that otherwise substantiates Al Kassar's desired testimony about the DEA agent's alleged vendetta against him and fabrication of evidence. For Al Kassar's claim to prevail, therefore, the Court would have to assume that the jury would have credited Al Kassar's assertions about his innocence and prosecutorial misconduct based on nothing but his self-serving testimony, and in the face of the volume of other evidence against him. See, e.g., Lang v. United States, No. 02 Cr. 1444 (SAS), 2009 WL 4788430, at *6 (S.D.N.Y. Dec. 9, 2009) ("highly improbable" that self-serving testimony attacking truthfulness of prosecution's cooperating witness would have changed guilty verdict in light of all other evidence); Rega v. United States, 263 F.3d 18, 22 (2d Cir. 2001) (no prejudice where petitioner's uncorroborated testimony would have "provided no evidence of significance that is not wholly dependent on either his credibility or on the incredibility of the witnesses against him"); Donato v. United States, 208 F.3d 202, 202 (2d Cir. 2000) ("testimony would not have been beneficial" given "considerable evidence" against defendant at trial). The Court finds no basis to make such an assumption.

In light of all these factors, "there is no reasonable probability that the verdict would have been different" had Al Kassar testified. Brown, 124 F.3d at 81. Because his failure to testify did not prejudice him, Al Kassar fails to satisfy the second Strickland prong and this ineffective assistance claim should also be rejected.

---

[7]    To the extent that Al Kassar desired to proffer evidence of his having collaborated with Spanish law enforcement officials in the past, he had that opportunity when two such individuals' taped testimony was played to the jury as part of the defense case. Tr. at 1358-59.

**2.  Al Kassar May Not Challenge The Verdict By Means of a Juror's Publication**

Al Kassar argues that the validity of the verdict has been thrown into doubt by the

publication of Cohen's City Journal article.  Specifically, he contends that the article shows that

"the jury relied on evidence nowhere to be found in the record."  Pet. Mem., at 24.  This claim is

also without merit.  To begin with, Al Kassar makes no attempt to explain why this issue was not

raised during his direct appeal and accordingly should not be summarily dismissed under the

procedural default rule, which applies to a claim of this kind.  See Bousley, 523 U.S. at 622.  As

the Government observes, Gov't Opp., at 28-29, Cohen's article was published in the summer of

2009 and Al Kassar's appeal brief was submitted to the Second Circuit on March 8, 2010.  See

Pet. Mem., Exhibit R; Docket Entry for Brief on Behalf of Al Kassar, dated March 8, 2010 (No.

09 Cr. 1051).  Consequently, barring the existence of any objective factor such as external

interference that would have impeded Al Kassar's ability to raise them on appeal, any claims

arising from the publication of the article are procedurally barred.  See Coleman, 501 U.S. at

753.  Al Kassar proffers no such factor.  Moreover, because Al Kassar fails to establish any

prejudice on the merits of the claim, as described below, there is no concern of a "fundamental

miscarriage of justice" that would warrant overlooking the procedural default.  See McCleskey,

499 U.S. at 494.

Notwithstanding the procedural bar, the juror-article claim simply repackages the

insufficient nexus theory previously raised under the umbrella of Al Kassar's ineffective

assistance of counsel claim.  By honing in on Cohen's description of how the jury believed that

the United States was "using" helicopters in Colombia, Al Kassar is under the impression that he

has definitive proof of a deficiency in jury deliberations: because the Government did not proffer

any evidence on this point, the jury had no basis to find that there was U.S. operation of

22

Case 1:13-cv-03541-JSR-JLC   Document 12   Filed 04/08/14   Page 23 of 25

helicopters in Colombia, rendering the conviction suspect. Pet. Mem., at 24-25. In reality, Al Kassar's entire line of reasoning is based on the same misapprehension of the legal standards governing the anti-aircraft missile conspiracy charge. As previously discussed, Al Kassar's conviction never depended on whether in fact the United States owned, leased, or utilized helicopters, only that Al Kassar intended to sell missiles for use against aircraft he believed were linked to the United States. As also noted, the record was replete with testimony and recorded evidence enabling the jury to reach such a conclusion.

As a consequence, Cohen's post-verdict article implicates none of the exceptions to Rule 606(b)'s prohibition on the use of juror statements or testimony to impeach verdicts. Al Kassar makes no showing of "extraneous prejudicial information," improper "outside influence," or error with the verdict form. See Fed. R. Evid. 606(b)(2). No evidence of any kind of prejudicial influence or other impropriety is presented that would justify an inquiry into the soundness of the jury's verdict. See Stewart, 433 F.3d at 302-03 (observing that "[p]ost-trial jury scrutiny is disfavored"). Al Kassar attempts to render Rule 606(b) inapplicable by highlighting Cohen's publication of the article as evidence of his "little interest, if any, in the quiet enjoyment of privacy and anonymity" after jury service, values that the Rule is intended to protect. Pet. Mem., at 23-24. That may be so, but even accepting this premise, Al Kassar provides no authority for why it should be enough to disregard the clear text of Rule 606(b) or the strong interest in maintaining the presumption of finality and impartiality given to jury deliberations that are not otherwise marked by impropriety. See United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) ("The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.").

Accordingly, Al Kassar's attempt to challenge his verdict based on statements contained within Cohen's article should be rejected.

### 3. No Hearing is Necessary

Finally, the Court concludes that it is able to resolve Al Kassar's petition on the submissions of the parties and the relevant portions of the record from the underlying criminal proceedings. See Puglisi, 586 F.3d at 213 (collecting cases). Although the statements from Al-Kassar and his trial attorney present starkly different versions as to whether Al Kassar was advised that the decision to testify was his, these differences do not, by themselves, create the need for a "full-blown testimonial hearing." Chang, 250 F.3d at 86; see also Puglisi, 586 F.3d at 213. No hearing is required to resolve whether Al Kassar's trial counsel's performance fell below the standard of reasonableness because Al Kassar cannot establish prejudice, and neither the record nor Al Kassar's own arguments demonstrate that an evidentiary hearing would overcome this deficiency. See Capalbo v. United States, No. 10 Civ. 2563 (LAP) (JLC), 2012 WL 1288486, at *30 (S.D.N.Y. Apr. 16, 2012), Report and Recommendation, adopted by 2012 WL 3779190 (S.D.N.Y. Aug. 31, 2012).

## III.  CONCLUSION

For the reasons set forth above, I recommend that Al Kassar's petition be denied.

## PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff and the undersigned, United States Courthouse, 500 Pearl Street, New York, New

York 10007.  Any requests for an extension of time for filing objections must be directed to

Judge Rakoff.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL**

**RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE**

**REVIEW.**  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  See Thomas v. Arn, 474 U.S. 140 (1985);

Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596

F.3d 84, 92 (2d Cir. 2010).

Dated: April 8, 2014
    New York, New York

JAMES L. COTT
United States Magistrate Judge

25